**In re Robert D. ARMSTRONG, Jr., Debtor.**

**Bankruptcy No. 386–30008–A–11.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

May 12, 1987.

Michael F. Wurst, Decker, Hardt, Kopf, Harr, Munsch & Dinan, Dallas, Tex., for trustee.

Charles Ory, Palmer & Palmer, P.C., Dallas, Tex., for debtor.

### AMENDED OPINION

HAROLD C. ABRAMSON, Bankruptcy Judge.

In this proceeding the court is asked to determine whether certain monies received by Robert D. Armstrong, Jr., (the "Debtor") are property of the estate under Bankruptcy Code (the "Code") Section 541(a)(1) or excluded from that classification under Section 541(a)(6). The acting Chapter 11 trustee, Michael F. Wurst ("Trustee"), asserts that all such monies are property of the estate and the Debtor asserts that all or part of the monies are "earnings from services performed by an individual debtor after the commencement of the case". This is a core proceeding under 28 U.S.C. § 157 and 11 U.S.C. § 541. This memorandum constitutes Findings of Fact and Conclusions of Law under Bankruptcy Rule 7052.

The parties have submitted a Joint Pretrial Order which sets out the operative facts. They have stipulated that the scope of the issue is limited to the question of entitlement to the funds in question only as between the Debtor and the Trustee, without prejudice to possible claims by or against third parties.

The case was commenced by voluntary petition, filed January 2, 1986. The Trustee was appointed on October 31, 1986. Prior to the commencement of the case and for some time during its pendency, the Debtor operated an insurance company under the assumed name "United Agents Group". United Agents Group was a sole proprietorship, though the Debtor did cause the formation of an entity known as "United Agents Group, Inc." for the purpose of preserving exclusive use of the name "United Agents Group". During the time between January 1, 1986 and August 21, 1986, funds in the approximate amount of $2,799,031.00 flowed into United Agents

Group. Of this amount, approximately $507,000.00 remained after payment of commissions, claims, and expenses through that period. The character of this sum, $507,000.00, is at issue here.

On October 8, 1986, Cynthia Armstrong filed her Motion for Contempt and Sanctions, alleging, *inter alia*, that the Debtor had removed approximately $400,000.00 of these funds to Hong Kong where he purchased a plastic extrusion machine.[1] The Debtor had contended that these funds were post petition "commissions" and that he acted on advice of his counsel, Mr. Jay M. Goltz. Shortly before these allegations were filed, the Debtor sold his insurance company to Old American County Mutual Fire Insurance Company ("Old American") through a sale of stock. Reference to contentions that the $400,000.00 was from a reserve fund made available because of the sale of stock is found in these allegations.

Thus, the record reflects various characterizations of these funds as either: (1) insurance commissions, (2) reserve account proceeds, (3) business profits, or (4) compensation for services rendered to the United Agents Group.

United Agents Group, Inc. was party to a certain agency agreement under which it acted as General Agent for Old American as to certain species of insurance contracts. Under this agency, Debtor (Debtor and United Agents Group are treated interchangeably for purposes of simplicity) received from independent insurance agents and sub-agents (collectively called "subagents") applications for high risk, monthly automotive insurance policies. These applications were processed via a computerized system which was operated by the office staff independent of personal supervision by the Debtor. The computer automatically rated risks and performed other mechanical functions and it was an essential component of the business.

Premiums were submitted with the applications. This cash flow was allocated as follows:

(i) $100.00 in premium received from subagent.

(ii) Debtor keeps a contingent commission of 35%, consisting of a 17.5% commission payable to the subagent and a 17.5% commission potentially payable to the Debtor.

(iii) 3% of the premium was retained by and forwarded to Old American as a fronting fee.

(iv) 1.25% of the premium would be forwarded to the State Board of Insurance as a premium tax.

(v) 5.5% of the premium would be forwarded to a reinsuring company as a reinsurance fee.

(vi) The balance, approximately 55.25%, would be retained by the Debtor as a fund from which claims would be paid. In the standard course of the Debtor's operations, the Debtor held both the 55.25% plus the 17.5% commission previously payable to the Debtor. To the extent claims exceeded the pool of 55.25%, the excess would be payable from the 17.5% commission. Conversely, to the extent claims fell short of the 55.25%, the excess remaining over the amount of claims would ultimately be payable to the Debtor as contingent profit.

A substantial portion of the insurance policies portfolio renewed each month. A greater number of applications were received in 1986 than in previous years. This was not a result of any direct contact between the Debtor and the insureds since all policy applications were submitted by subagents. The Debtor did not actually meet with any of these agents, actually solicit any business, or take part in the day-to-day operation of United Agents Group; rather the Debtor's role was that of an overseeing executive, as is demonstrated by the fact that the Debtor terminated the relationship with approximately two-thirds of these subagents in early 1986 due to unhappiness with the volume and risk rating of the policy applications they submitted.

---

1. The Debtor and Cynthia Armstrong are currently involved in divorce proceedings in the state court.

Apart from the one instance noted where the Debtor was involved in terminating the relationship with a number of agents, the activities of the Debtor vis a vie United Agents Group largely consisted of financial and executive decisions regarding settlements, policy limits, litigation, and rate determination. This did not necessitate frequent involvement however. It was not uncommon for several weeks to go by without an appearance by the Debtor. Most of the Debtor's communication with United Agents Group was by telephone. In sum, it appears that, as stated in the Joint Pretrial Order: "The business of United Agents Group, by and through the assistance of [the staff], essentially ran itself."

The court is faced with a situation much like the facts of *In re FitzSimmons*, 725 F.2d 1208 (9th Cir.1984). In *FitzSimmons*, the Court of Appeals construed the meaning of Section 541(a)(6) in the context of sole proprietorship that was a Chapter 11 debtor. Rejecting the concept that earnings of the sole proprietorship were excluded from property of the estate, the court held that "§ 541(a)(6) excepts from the proceeds of the estate only those earnings generated by services personally performed by the individual debtor." *Id.*, at 1211.

This court's review of the record demonstrates no earnings of United Agents Group that are attributable to "services personally performed by the individual debtor". The claim of the individual debtor to the $507,000.00 fund at issue is attributable solely to an ownership interest. The General Agency under which United Agents Group operated was entered into in the name of United Agents Group, Inc., and the event providing the full availability of the fund to the individual Debtor was a sale of the stock of the agent entity. No occasion is presented for the court to pass upon the propriety of a "salary" for none is claimed. The label of "commissions" placed on the earnings of United Agents Group does not substitute for the requirement that they be actually earned for personal services. Here the activities of the individual debtor were those of an overseeing director, protecting and managing his property.

The court finds that this case is squarely governed by the holding of *FitzSimmons*, and also that the $507,000.00 fund is "sufficiently rooted in the pre-bankruptcy past and so little entangled in the debtor's ability to make a fresh start that it should not be excluded from property of the estate." *Segal v. Rochelle*, 382 U.S. 375, 380, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966); *In re Ryerson*, 739 F.2d 1423 (9th Cir.1984). The availability of the fund after the post petition-sale of the ownership interest in United Agents Group to Old American is the result of a business transaction by which the fund was freed from certain contingent charges rather than compensation for personal services. Thus, it is not included in post-petition earnings from services performed by an individual debtor. *In re Lotta Water Land Co.*, 25 B.R. 32 (Bankr.N.D. Tex.1982).

The Debtor cites the court to *In re Kervin*, 19 B.R. 190 (Bankr.S.D.Ala.1982), in which commissions earned by an insurance agent were found to be within the "personal earnings" exception of § 541(a)(6). In *Kervin* the commissions received by the debtor for insurance policies written post-petition and renewal commissions earned post-petition were due the debtor only after he had performed services involving his own labor. As in *In re Palmer*, 57 B.R. 332 (Bankr.W.D.Va.1986), the compensation, though related to pre-petition services, was contingent on satisfactory performance of services by the individual debtor, post-petition. In each case, post-petition services personally performed by the individual debtor were necessary before the compensation could be said to have been earned. Had there been no requirement of post-petition services personally performed by the individual debtor, the § 541(a)(6) exclusion would not have applied. *Cf., In re Marshburn*, 5 B.R. 711 (Bankr.D.Colo. 1980) (commissions earned pre-petition, but paid post-petition, were property of the estate).[2]

---

**2.** The court has also considered the following cases cited by Debtor, but finds no support

The record contains no indication that personal services rendered by the Debtor post-petition contributed to the $507,000.00 fund. The court finds that no post-petition personal services were required as a predicate to the realization of these monies. The court holds that no part of the $507,000.00 fund made available after the sale of United Agents Group to Old American was exempt under § 541(a)(6), and that all of the fund is property of the bankruptcy estate.

At the February 28, 1987 hearing on this matter, reference was made to certain payments to be made to the Debtor under a non-competition clause of the agreement for the sale of United Agents Group. These payments are set out in the agreement as $5,000.00 per month. In accordance with the Joint Pretrial Order, the court does not address the characterization of the non-competition payments in this opinion other than to note that their existence has no effect on the court's characterization of the $507,000 fund.[3] Counsel for the Trustee is directed to prepare an appropriate form of order.

therein for the Debtor's arguments. *In re Selner,* 18 B.R. 420 (Bankr.S.D.Fla.1982); *In re Hodgson,* 54 B.R. 688 (Bankr.W.D.Wis.1985).

3. *In re Marshburn, supra.*